| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:07-CR-100** |
| | ) | |
| **CHARLES A. BOYCE** | ) | |

## MEMORANDUM OF OPINION AND ORDER

This matter is before the court for resolution of a motion to dismiss and a motion to suppress evidence filed by the defendant, Charles A. Boyce ("Boyce"). The United States of America ("the government") has filed responses in opposition to the motions and Boyce has filed reply briefs. The court held hearings on the motions on June 5, 2009, June 22, 2009, July 24, 2009, and October 14, 2009. The court has reviewed and considered the numerous briefs submitted by the parties, the evidence presented at several hearings, the arguments of counsel, and the testimony of the defendant. For the reasons set forth below, the motion to dismiss is DENIED and the motion to suppress is DENIED. This case will be set for final pretrial conference and trial by way of a separate docket entry.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 27, 2007, Boyce was pulled over by Fort Wayne Police patrol officer Marc Deshaies. Deshaies testified that the day before, Fort Wayne Police had issued a radio notice to its patrol officers that a silver Ford Taurus containing several African American males had been seen in the "southeast quadrant" of Fort Wayne and that the occupants "were suspected to go on a shooting spree . . ." and that they had been "making threats to shoot up a house in the southeast quadrant." Transcript of Hearing on Motion to Suppress Held April 22, 2008 (hereinafter "Tr.,

p. ___"), pp. 6-7.  On the day in question, Deshaies was patrolling the southeast quadrant of the city.  *Id*., pp. 5 and 6.  Deshaies was stopped at a stoplight at the intersection of Pontiac and Hanna streets, facing east, when he noticed a silver Ford Taurus across the intersection from him, facing west.  *Id*., p. 6.  When the light turned green, both Deshaies (who was driving a fully marked police cruiser) and the silver Ford Taurus proceeded through the intersection.  *Id*., p. 8.  As the two vehicles passed each other, Deshaies testified that "[t]he driver [of the Ford Taurus] looked at me in my car.  Immediately, when he saw me, he turned, looked down, looked away, shielding his face from me as he passed by."  *Id*.  Deshaies testified that when someone looks at him, then looks away and tries to shield their face from him, it arouses suspicion.  *Id*.  Consequently, as a result of what Deshaies interpreted as suspicious behavior on the part of the driver of the Taurus and due to the report aired the previous day, Deshaies turned around and followed the Taurus with the intent to "see who the registered owner was, make sure the plates and everything was [sic] valid, check what information was available on the car from outside."  *Id*., p. 9.  As soon as he turned around, Deshaies noticed that the Taurus had increased its speed substantially, causing Deshaies to "accelerate, get around traffic, exceed the speed limit all the way down Pontiac trying to catch up to the vehicle."  *Id*.  Deshaies testified that he was exceeding the posted speed limit by at least 20 miles per hour in an attempt to catch up to the Taurus.  *Id*., p. 10.  Deshaies was able to get close enough to the vehicle to get the license plate number on the Taurus which he then fed into his in-car computer.  *Id*.  Deshaies had not yet activated his emergency lights, but he was becoming "fairly concerned that the vehicle was leading me on a pursuit . . . due to the speed and the immediate turns that it was starting to make."  *Id*., pp. 10-11.  Deshaies's computer check revealed that the Taurus was registered to

Charles Boyce. *Id.*, p. 13. Deshaies testified that he then "ran Mr. Boyce's name in my computer and got a direct–what we call confirmation hit for a warrant out of state." *Id*. Deshaies was then able to pull up a photo of Boyce on his computer and "knew it was the driver that I passed at Pontiac and Hanna." *Id.*, p. 14. At that point, Deshaies activated his emergency lights and initiated a traffic stop. *Id.*, p. 15. Deshaies approached the Taurus, asked Boyce to produce his driver's license and registration form, and noticed that Boyce was "patting about his waist with his hands." *Id.*, p. 16. Deshaies became concerned that Boyce might have a weapon. *Id*. After Boyce produced an Indiana identification card, Deshaies instructed him to exit his vehicle so the officer could place Boyce in handcuffs. *Id.*, p. 17. When Boyce asked Deshaies why he was being placed in handcuffs, the officer told him that "he had an out of state warrant for his arrest out of California." *Id*. Boyce told Deshaies that he knew about the California warrant but that California "did not want to extradite him." *Id.*, p. 19. Deshaies informed Boyce that he would have to detain him in order to confirm the information about the warrant. *Id*. Once Boyce was handcuffed, Deshaies performed a "pat down" search to ensure that Boyce did not have a weapon on him. *Id.*, p. 19. When he did so, Deshaies felt "something big balled up in [Boyce's] pocket." *Id.*, p. 20. When Deshaies removed the item, he noticed it was a "nylon style wave cap" and he proceeded to place the cap on the roof of the vehicle. *Id*. When he did so, "a small white waxy rock fell out of the wave cap onto the top of the car." *Id*. Based on his experience as a police officer, Deshaies "knew it to be crack cocaine . . . ." *Id*. Deshaies transported Boyce to the Fort Wayne Police Department, where he later learned that the California warrant for Boyce was still active. *Id.*, p. 21. During an inventory search of Boyce's vehicle subsequent to his arrest, police discovered "close to over [sic] a hundred grams of crack

cocaine in the back seat and over thirty grams of marijuana in the back seat as well as scales . . . ." *Id*. Boyce was charged by way of an Indictment filed on December 19, 2007, with one count of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Docket at 1.

On March 20, 2008, Boyce filed his motion to suppress evidence (docket at 16). The court held the first of several evidentiary hearings in this case on April 22, 2008, and at the conclusion of that hearing the court directed the parties to file briefs discussing the issues raised. Boyce filed his brief in support of his motion on May 29, 2008 (docket at 23, "Defendant's Brief in Support of Motion to Suppress"). The government filed its opposing brief on June 16, 2008 (docket at 25, "Government's Response to Motion to Suppress") and Boyce filed a reply on July 16, 2008 (docket at 28). This court entered an Opinion and Order on August 20, 2008, denying the motion (docket at 29). Boyce later moved to continue all pre-trial motion deadlines to afford him an opportunity to obtain forensic evaluations and that motion was granted on November 13, 2008 (docket at 40). On February 5, 2009, Boyce filed his motion to dismiss and supporting brief (docket at 47 and 48, "Defendant's Brief in Support of Motion to Dismiss"). The government filed its response in opposition to that motion on February 19, 2009 (docket at 57, "Government's Response to Motion to Dismiss") and Boyce filed his reply brief on March 16, 2009 (docket at 59). The court then held the additional evidentiary hearings outlined above. After the hearings concluded and transcripts were prepared and distributed to the parties, Boyce filed an additional brief in support of his motion to suppress on December 8, 2009 (docket at 82, "Defendant's Second Brief in Support of Motion to Suppress"). The following day, Boyce filed a supplement to his Second Brief (docket at 83, "Defendant's Supplement"). The government

filed an additional response in opposition to this motion on January 7, 2010 (docket at 84,

"Government's Second Response in Opposition to Motion to Suppress") and Boyce filed his

final reply brief on January 27, 2010 (docket at 90).[1]

## DISCUSSION

Boyce's suppression argument is twofold. First, he claims that Deshaies had no

reasonable suspicion to initiate an investigatory stop of Boyce's vehicle since there were "more

than likely hundreds, if not thousands, of such silver Ford Tauruses roaming the streets of Fort

Wayne, Indiana, on that particular evening." Defendant's Brief in Support of Motion to

Suppress, p. 4. Second, Boyce argues that Deshaies only saw Boyce "for a very brief period

from a distance of perhaps fifteen (15) feet away, in poor light, and for a very brief time." *Id*., p.

5.[2] Boyce contends that "the facts as they existed were not sufficient to provide a reasonable

suspicion that the driver of the [Ford Taurus] was the person identified on the computer . . . as

Charles Boyce." *Id*.

In addition to challenging the traffic stop, Boyce argues that the pat-down search

Deshaies performed, which resulted in the discovery of crack cocaine, violated Boyce's Fourth

Amendment right to be free of unreasonable search and seizure. *Id*., p. 6. Boyce claims that

---

[1] Throughout this Opinion and Order the court will cite to specific page numbers in the parties' various briefs and to pages in the transcripts from the various hearings held in this case. For ease of reference and the sake of consistency, those page numbers are the page numbers assigned to each pleading or transcript by this court's electronic docketing system and appear near the top right of each page referenced. These page numbers may or may not coincide with the page numbers placed on the various documents by the parties themselves.

[2] Deshaies testified that he encountered Boyce at dusk on the evening in question and that Boyce quickly turned and concealed his face from Deshaies as the two men passed each other in their vehicles.

Deshaies searched him and removed the item from Boyce's pocket as a result of an unreasonable belief that Boyce might be armed. *Id.* Boyce argues that nothing in the undisputed factual scenario presented was sufficient to produce in Deshaies a reasonable suspicion that Boyce was armed. *Id.*, p. 7. Boyce makes no mention of the fact that he was exceeding the speed limit after Deshaies began following him, or that he made a series of quick and apparently random turns during that time, nor does he present any evidence or even argument that those facts are not true. Furthermore, Boyce does not dispute the fact that he was the subject of an outstanding warrant issued in California.

In its response brief, the government summarizes its argument as follows:

> In arguing an insufficient basis for the traffic stop, the Defendant alleges that the description of the drive-by shooting vehicle was too general to justify the stop and that it was not reasonable to suspect a registered owner to be driving his own vehicle. The government asserts that the stop was not based upon a match to the description of the car involved in the threatened shooting; rather, the stop was justified (1) because, observing considerable evasive behavior, Officer Deshaies reasonably suspected that the driver was the registered owner who was wanted on an outstanding arrest warrant and (2) because the Defendant was speeding. Ultimately, even if the traffic stop was improper, the arrest warrant dooms the Defendant's challenge because it is an independent source justifying his arrest.

Government's Response to Motion to Suppress, pp. 5-6. It is the government's position, then, that the totality of the circumstances justified both the traffic stop and the pat-down search of Boyce on November 27, 2007.

As for his motion to dismiss, Boyce bases this motion on the fact that the video recording system that Deshaies had in his patrol car at the time he stopped Boyce on November 27, 2007, was apparently not working properly at the time or, for other reasons discussed below, the video recording of the traffic stop involving Boyce was not properly preserved. Motion to Dismiss, docket at 47, pp. 1-2. Boyce retained an expert who reviewed the hard drive from the recording

unit in question and determined that the earliest recorded event on that hard drive was from October 30, 2008, and that the system had recorded over any earlier traffic stops including the one involving Boyce.  *Id.*, p. 2.  Boyce contends, then, that "the Fort Wayne Police Department should have preserved the hard-drive as evidence and that the continuing use of the hard-drive has resulted in the loss of evidence and has prevented the Defendant from either retrieving relevant exculpatory data or determining if there was any effort on the part of the Fort Wayne Police Department to tamper with such data."  *Id.*, p. 2.  For this reason, Boyce "requests the Court enter an Order dismissing the case for destruction or loss of exculpatory evidence."  *Id.*

### 1. **Motion to Dismiss.**

In his Memorandum in Support of Motion to Dismiss, Boyce correctly states that there is "a three (3) part test for a determination as to whether the Defendant is entitled to a finding that there have been actions on the part of the Government, through the police department, which have resulted in loss of evidence.  It appears that the agency must have: (1) acted in bad faith when it destroyed or failed to preserve evidence; (2) the evidence possessed must have had an apparent exculpatory value; and (3) the evidence was, to some extent, irreplaceable."  Docket at 48, p. 1 (citations omitted).  He states that "[r]emedies for destruction of evidence include dismissal."  *Id.* (citing *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993)).

The government argues that "the loss of the relevant video file was due to a computer problem with the in-car unit, that the loss of the video was not due to the bad faith of the police, and that there was no evidence suggesting any exculpatory value in the video before its loss." Defendant's Response to Motion to Dismiss, p. 1.  The government explains that "[p]rior to the suppression hearing on April 22, 2008, the government made repeated attempts to locate the

7

relevant video but learned that the problem was the unit's software." *Id*., p. 2. According to the government, the video systems in Fort Wayne Police Department patrol cars begin recording whenever the officer activates his vehicle's emergency lights. *Id*. The video recordings are stored on the unit's hard drive. *Id*. "When this hard drive becomes full of video files, the system is supposed to save the files on a disk; however, the problem with this unit was that the software did not adequately select all the files for copying onto the disk, resulting in the loss of some video files." *Id*. The government states that "[t]he equipment problems with the in-car system were particularly pronounced with Officer Deshaies's patrol car because his car was the first at FWPD to receive this problematic software and unit. Officer Deshaies had his patrol car in the City of Fort Wayne's Radio Shop multiple times in an effort to resolve the problems, and the in-car unit's manufacturer was actively assisting with the problem." *Id*. Therefore, the government argues, there was no bad faith on the part of the government (through the Fort Wayne Police Department or otherwise) that resulted in the loss of the video recording in question. The government contends that this fact defeats Boyce's motion to dismiss since "'[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserved potentially useful evidence does not constitute a denial of due process of law.'" *Id*., p. 5 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). In addition, the government argues that "[b]esides his failure to make this threshold showing of bad faith, the Defendant has never presented any evidence regarding what exculpatory evidence was supposedly on the video, how the exculpatory evidence was apparent before the video's loss, or why he cannot present competent evidence through cross-examination of Officer Deshaies or presentation of the testimony of the other witnesses including himself or other officers." *Id*., p. 6. For these reasons, the government

argues that Boyce's motion to dismiss should be denied.

In his reply brief, Boyce argues that "[i]t would seem to be pretty clear that the hard-drive and footage are of such a nature that it is not possible for the Defendant to obtain comparable evidence by other reasonable means. Defendant maintains that the exculpatory value of the audio and video is that it would provide evidence contradictory to the testimony of Officer Deshaies in respect to the basis for the stop, the search of Boyce, and the claim that drugs were found in the car." Defendant's Reply in Support of Motion to Dismiss, p. 2.

The court held evidentiary hearings on Boyce's motion to dismiss on June 5 and June 22, 2009. The transcript of these hearings appears at docket entry 72. At those hearings, the government presented ample credible evidence to support its position that the loss of the video recording of the traffic stop of Boyce was completely unintentional and not the result of any bad faith on the part of the government or the Fort Wayne Police Department. The first witness was Michael Reichart, who is the supervisor of the Police Department's Radio Shop. Tr., p. 5. Reichart began his testimony by explaining in detail the type of video recording system that was present in Deshaies's patrol car and how it operated. *Id.*, pp. 6-9. Reichart testified that he became aware that there were problems with the video system in Deshaies's vehicle and that similar problems were reported in other patrol cars. *Id.*., pp. 10-11. Reichart explained that the problem with the equipment in Deshaies's car (as well as several other patrol cars) was that once the hard drive in the system became full it would continue to operate without first downloading the recorded videos to a DVD. *Id.*, pp. 11-12. According to Reichart, the system "would not actually burn the DVD, and it would just continue to accumulate video and audio on the internal hard drive. It would not physically burn that DVD." *Id.*, p. 12. In other words, the software in

the system was mistakenly informing the hard drive that space "was available to be reused[.]" on

the system when, in fact, the system was full and should have downloaded its contents to a DVD,

thereby freeing up space for future recordings. *Id*. The Radio Shop noticed that this problem

was occurring "fleet-wide" and "contacted the manufacturer . . ." *Id*. Reichart also was present

when Boyce's independent computer expert examined the system in an attempt to recover the

video and audio from November 27, 2007. *Id*., pp. 13-14. Reichart also explained that

individual officers have no access to videos once they are recorded by the in-car system and

cannot delete the videos or transfer them to a DVD. *Id*., p. 19. Reichart testified that the

president of the company that manufactured the video system came to Fort Wayne and

specifically rode with Deshaies in Deshaies's vehicle to see how the officer was using the

system. *Id*., pp. 20-21. It was determined that Deshaies was utilizing the system properly but

that the system was failing to download videos and audio once the hard drive became full. *Id*., p.

21. Reichart testified that the system in Deshaies's car was installed in June of 2007 and that

Deshaies brought his vehicle into the Radio Shop about one month later complaining of

problems with the video recording system. *Id*., p. 21. The Radio Shop contacted the

manufacturer and worked with them in an attempt to remedy any problems. *Id*., pp. 21-22.

Reichart testified that other officers began bringing their patrol cars in at about the same time

reporting similar problems. *Id*., p. 22. Reichart testified that the Radio Shop and the

manufacturer were working hard to remedy any problems with the systems. *Id*., p. 23.

Also introduced into evidence during the hearing on June 5, 2009, were letters written

from Assistant U.S. Attorney Anthony Geller to defense counsel, Stanley Campbell. In one of

those letters, dated April 10, 2008, and introduced into evidence as Defendant's Exhibit C,

AUSA Geller informs defense counsel that the "FWPD is having difficulty retrieving the in-car video from the hard drive in Officer Deshaies's squad car; however, they are still working on it, and I will provide it when I receive it." Tr., Exh. C, p. 1. In another letter, dated September 5, 2008, and introduced as Defendant's Exhibit D, AUSA Geller informed defense attorney Campbell that he "may also call the manager of the City of Fort Wayne's Communications Radio Shop[.]" as a witness at an upcoming hearing to "explain how the [video recording] system works and the procedures associated with in-car videos." Defendant's Exhibit D, p. 1. Geller also stated in that letter that "Mr. Reichard [sic] will also testify as to the numerous problems experienced by officers with this particular unit, including Marc Deshaies (who happens to have been the first officer to test it out)." *Id*., p. 2.

This evidence concerning the video system in Deshaies's patrol car, the problems associated with it, the efforts on the part of the FWPD Radio Shop to retrieve videos from the system, the efforts by FWPD and the system's manufacturer to correct problems with the software, and the letters from Geller to Campbell acknowledging that the video of the stop could not be retrieved from the hard drive, all went unrebutted. Boyce's counsel conducted a thorough questioning of Reichart during the hearing but was unable to elicit any testimony that would challenge Reichart's knowledge or credibility. All of the evidence of record, in other words, supports the government's position that the failure to produce the video and/or audio recordings of Boyce's traffic stop was not the result of any bad faith on the part of the government. Furthermore, Boyce presented no evidence that any exculpatory evidence would be found on the recording even if it had been produced. Boyce has presented nothing more than his own speculative and conclusory argument that something on the video *may* contradict Deshaies's

version of events during the stop. Consequently, Boyce has failed to meet his threshold burden with regard to this missing evidence. His motion to dismiss on the grounds of lost evidence is DENIED.

### 2. Motion to Suppress Evidence.

As the court stated above, Boyce originally filed his motion to suppress on March 20, 2008. The parties filed briefs discussing the issues Boyce raised in that motion and the court held the first of several evidentiary hearings in this case on April 22, 2008, to address that motion. Following the hearing, both sides submitted their briefs. On August 20, 2008, the court entered an Opinion and Order denying Boyce's motion to suppress. Docket at 29. The court concluded, based on the record in the case at that time, that Deshaies had probable cause to stop Boyce, conduct a pat-down search of Boyce (which resulted in the discovery of crack cocaine) and arrest him (based on the discovery of the drugs and the fact that Boyce had an outstanding warrant for his arrest issued by the State of California). *Id*.

On February 5, 2009, Boyce filed a Motion for Reconsideration, asking the court to reconsider its August 20, 2008, Opinion and Order denying the motion to suppress. Docket at 45. Boyce also requested an opportunity to submit what he termed "additional evidence" that was not available to him prior to the court's ruling. *Id*. The government filed a response in opposition to the motion to reconsider. Docket at 46. The court then issued an Opinion and Order on April 17, 2009, in which the court denied in part and granted in part Boyce's motion for reconsideration. Docket at 61. In that Order, the court granted Boyce's motion to submit additional documentary evidence, but once again denied the motion on its merits. *Id*.

On September 24, 2009, Boyce filed a "Request for Further Hearing." Docket at 76. In

that pleading, Boyce represented that he had obtained evidence that called into question Deshaies's credibility. Specifically, Deshaies had testified during a previous hearing that he was able to identify Boyce as the driver and owner of the Ford Taurus that Deshaies pulled over by, among other things, pulling Boyce's picture up on his in-car computer. However, the evidence Boyce obtained indicated that no such photo existed and/or that no such photo could have appeared on Deshaies's in-car computer screen as Deshaies said it had. *Id.*, pp. 1-2. The court granted Boyce's latest request and held yet another evidentiary hearing on October 14, 2009. The intended purpose of that hearing was to permit both sides to question Deshaies as to whether he actually was able to pull up a picture of Boyce on his in-car computer and to test his credibility on this point. At the hearing, evidence and testimony was presented by both sides and Deshaies testified yet again. Boyce also raised other issues during the hearing in an attempt to discredit Deshaies and cast doubt on his credibility. In an effort to permit both sides to present all the evidence they wished, and in an effort to finally close the record as to Boyce's motion to dismiss and motion to suppress, the court heard evidence on all issues raised by Boyce.

Deshaies testified at the hearing held on October 14, 2009, concerning the issue of Boyce's photograph on his in-car computer. At the outset of that hearing, counsel for the government explained that the government was willing to stipulate that no photograph of Boyce would have been available on Deshaies's in-car computer on November 27, 2007, but that Boyce refused to enter into such a stipulation. Transcript of Hearing, October 14, 2009, docket at 81, p. 4. Instead, Boyce insisted on hearing testimony from Deshaies on this point. *Id.*, pp. 4-5. The court acknowledged Boyce's arguments and the hearing proceeded with the government calling Deshaies as a witness once again. *Id.*, p. 27. Under questioning, Deshaies testified as follows:

Q.  Try to cut to the chase, it turns out that that testimony [about Deshaies seeing a picture of Boyce on his in-car computer at the time he pulled him over] was incorrect; is that right?

A.  Yes, sir.

Q.  Was this an intentional thing or was this a mistake or what?

A.  Absolutely not intentional, sir.  Just over the course of so many hearings I probably have viewed Mr. Boyce's photo the upside of a hundred times and obviously I had transposed that image into my head to viewing it at the scene also.

Q.  What do you mean in reviewing the photo?

A.  Every time that the defense or the prosecution has asked me to review the case, I have to bring up Mr. Boyce's name in order to get the case information. Every time I do that I view his photo, view the same screen I would view during a normal traffic stop.

Q.  And, as it turns out, would these have been the photos that were taken after you arrested him on the 27th of November?

A.  It would have been the photo from that night, yes, sir.

Q.  Which was taken after the stop?

A.  Correct.

Q.  Now, did I call you a lot asking about the in-car video for example?

A.  Yes, sir.  I've probably been called in regards to this case fifty to sixty times over the course of a two-year period of time.

Q.  Were many of those prior to the suppression hearing on April 22nd of '08?

A.  Yes, sir.

Q.  On each of those occasions would you then have viewed the picture and viewed this information in the system?

A.  Yes, sir.

Q.  On each of those occasions then would you have viewed the picture and

viewed this information in the system?

A. Yes, sir. The route to get to the information in the system is, first, by looking up the person's name and then by looking for that case specifically.

Q. So the bottom line is what happened do you think here? What caused the mistake?

A. I've seen that screen so many times that when I was reviewing it–when I was testifying in court that the image of his picture on the screen came to mind, I believe that to be the same from that evening. I didn't realize that there was no picture that evening.

Q. Would it have been your normal practice on a traffic stop to view a photograph like that prior to the stop?

A. Yes, sir. The second I run anyone's name that photo would come up.

Q. Were there any other mistakes, to the best of your recollection, that you can think of with regard to your testimony?

A. No, sir. I scrutinized by testimony, and I have not seen any other mistakes.

*Id.*, pp. 28-29. The court found Deshaies's explanation reasonable and his testimony on this point completely credible. Deshaies admittedly made a mistake when he testified that he viewed Boyce's picture on his in-car computer during the traffic stop, but the mistake in his testimony was obviously inadvertent.

The next issue Boyce raised was his contention that the traffic stop did not occur the way Deshaies testified it did. At the hearing held on June 22, 2009, Boyce took the stand to testify about the traffic stop. Boyce testified as follows:

Q. Taking you back to November the 27th, about 7:45 in the evening, were you in your car at the intersection of–at Pontiac, and what was the intersection you were at?

A. Pontiac and Hanna.

Q. Pontiac and Hanna, okay. And we've heard previous testimony about that from Officer Deshaies, correct?

A. Correct.

Q. My understanding is that, at the intersection, you were eastbound on Pontiac; would that be correct?

A. I believe I was going east, yes, sir, and [the] officer was facing west.

Q. . . . Officer Deshaies's patrol car was coming west on Pontiac?

A. We were stopped at the stoplight, and I was the first vehicle. I was facing east. He was facing west, and the light was red.

Q. When the light turned green, then, could you describe for us what happened?

A. Well, when light turned green, I proceeded through the green light, you know, driving along as a law abiding citizen. And the officer claims that I went all th way down Pontiac to Anthony street. I went down Pontiac to Winter Street, okay, and stopped at my sister's house at . . . Winter Street to pick up a plate of food.

Q. Okay.

A. Okay. After that, I proceeded all the way down Winter Street past–crossed over Rudisill Street, okay. Officer Deshaies came right at the green–it was a red light, and he made a right turn off of Anthony onto Rudisill, as I'm crossing over Rudisill, okay, and gets behind my vehicle. I go to Baxter and make a left turn. He makes a left turn behind me. Mind you, I had no idea this was the same officer at Pontiac and Hanna. I had no clue, okay. So I proceed to Baxter and Anthony to make a left turn, all right. And he pulled me over. We, he initiated his lights, and I pulled over at Rudisill and Anthony.

Q. If I'm understanding you correctly, from where the two of you were at the intersection at Pontiac and Hanna, you had proceeded onto Winter Street and had stopped there for some period of time before continuing on?

A. Just for a brief moment, yeah. And the plate of food–my plate of food would have been in my vehicle, as well. If you look at all the things that was taken [sic] out of my vehicle, it will be there.

. . .

Q. Now, at any time in you're [sic] route of travel, were you exceeding the speed

limit?

A. No, sir, I was not.

Q. So that if Officer Deshaies had had his video camera on, that video would not have shown you, at any time, traveling above the speed limit or driving at an excessive rate of speed?

A. No, sir, it would not.

Tr. of Hearing, June 22, 2009, docket at 72, pp. 81-84. Thus, Boyce clearly disputed many of the factual assertions Deshaies made about how the traffic stop occurred. Primarily, Boyce contended that after he first encountered Deshaies, he then drove to his sister's house, picked up plate of food, and drove off. Boyce contended that he was never speeding and that he was driving "as a law abiding citizen." As a result of Boyce's testimony, the plate of food in Boyce's car became a possibly important piece of evidence, since it could arguably support Boyce's version of events. The Fort Wayne Police Department inventory sheet was stipulated into evidence at the hearing held on July 24, 2009. *See* docket at 74, Exhibit and Witness List, Government's Exhibit 5. That inventory sheet indicates that in the trunk of Boyce's car police found "liquor, clothes, [a] jack, food, [and] misc[ellaneous] items." *Id*.

In an effort to bolster his credibility on this point, Boyce called his sister, Adrienne Denise Moore, as a witness at the July 24, 2009 hearing. Moore confirmed that she lived on Winter Street at the time of the incident involving her brother. Tr. of Hearing, July 24, 2009, docket at 75, p. 104. Unfortunately for Boyce, his sister's testimony did not support his factual allegations. Moore testified that Boyce did, indeed, come to her home to pick up a plate of food. She testified, very confidently and credibly, that this occurred at 7:30 p.m. on Thanksgiving day

of 2007. *Id.*, p. 105.[3] Moore also testified that Boyce stayed at her home "about 10 minutes,"

then left with a plate of food she had prepared for him. *Id.*, p. 106. On cross-examination by

government counsel, Moore reiterated that Boyce picked up the plate of food in question on

Thanksgiving day of 2007:

> Q. Now, what was the date that Mr. Boyce came over on this occasion?
>
> A. It was Thanksgiving.
>
> Q. Thanksgiving Day, what year?
>
> A. 2007.

*Id.*, p. 108.[4] Moments later during her testimony, government counsel asked Moore yet again if

---

[3] It is undisputed that November 27, 2007, was *not* Thanksgiving day. The court takes judicial notice that Thanksgiving day in 2007 fell on November 22, some five days before Boyce was arrested. The significance of this fact will–and how it damages Boyce's credibility–will become clear below.

[4] Moore also testified that in November of 2007, Boyce was stopping by her house more than once a week. *Id.*, p. 108. She testified that both she and her late husband were very close to Boyce and saw him often at their home. *Id.*, pp. 108-109. She testified that in November 2007, Boyce had a job delivering newspapers in Fort Wayne and that he was living in Fort Wayne at that time. *Id.*, p. 109. She testified that he was in Fort Wayne on a "daily basis" at that time. *Id.* This testimony directly contradicts Boyce's own testimony. On questioning by government counsel, Boyce testified that he was living in Indianapolis at the time, that he was only in Fort Wayne to visit family, and that he "was resident [sic] in Indianapolis." Tr. of Hearing, June 22, 2009, p. 100. Boyce explained, somewhat vaguely, that he was a "subcontractor" for Fort Wayne Newspapers but that he had "other people work the job for me." *Id.*, p. 99. This testimony was Boyce's attempt to explain why he had $511.00 in cash on his person at the time he was arrested. But Boyce's testimony about his actual place of residence and his employment in November of 2007 was just one example of the often confusing and non-credible testimony he gave before the court. (Boyce also testified that there were absolutely no drugs in his vehicle when he was pulled over and arrested, implying, without explicitly stating, that the large amount of drugs found in his vehicle were somehow placed there without his knowledge. *See, e.g., id.* at pp. 108-109 ("I never had drugs that night on my person, period.")). Boyce's testimony was not believable on virtually any point, and his nervous and anxious demeanor on the witness stand contributed to his lack of credibility.

she was certain about the day, and Moore continued to insist that Boyce visited her home and picked up the plate of food on Thanksgiving day. *Id*., p. 110. She even went so far as to testify about what kind of food she had prepared, which included "greens," "dressing, [and] turkey." *Id*. Finally, on redirect examination, defense counsel attempted to clarify this point by asking Moore once again whether she was certain that Boyce was at her home on Thanksgiving day. Moore testified, for a third time, as follows:

> Q. Now, let me ask you this: Do you have a–'cause my own recollection is that, when you were telling me about this after our last hearing, your recollection was that it was sometime around Thanksgiving of 2007. And I guess my question is: Do you have a recollection of whether it was actually on Thanksgiving day or was it around Thanksgiving day?
>
> A. It was on Thanksgiving day.

*Id*., p. 113. In one last attempt to establish that he was at his sister's house on November 27, as opposed to Thanksgiving day itself, Boyce took the stand once again. On questioning from his attorney, Boyce testified as follows:

> Q. Okay. You've heard your sister testify about a time that you went by her house, picked up some food?
>
> A. Yes, that was November 27th, '07.
>
> Q. All right. Do you know whether that was Thanksgiving day or not that you were there?
>
> A. No, it was not Thanksgiving day. Her testimony was that it was Thanksgiving day, I believe.
>
> Q. Right.
>
> A. Her testimony should have been approximately Thanksgiving because Thanksgiving fell before November 27th. They were out of town on Thanksgiving day, to be accurate.
>
> Q. You think she was mistaken about it being Thanksgiving day?

A.  'Cause they were out of town.  Her and her husband were out of town on Thanksgiving that year.

Q.  Was this before or after Thanksgiving day that you had stopped by to get the plate of food?

A.  This was after Thanksgiving day.

Q.  All right.

A.  Like I said, she's went through [sic] a death of her husband, you know what I'm saying, and her having to remember an event that may not have been important to her, you know, that's asking a person a lot when they're grieving, okay.  And I believe that was very unappropriate [sic] to press her on exact dates and time, whether it's daytime or nighttime by Mr. Anthony Geller, you know what I'm trying to day, to try and confuse her on her testimony on what exact time, day, night, this, that, and other [sic].  She's not the actual one on trial here. I am.

*Id.*, pp. 115-116.  But Mr. Geller's questioning of Moore was very straightforward and not at all heavy handed.  Even defense counsel attempted to rehabilitate the situation by giving Moore a chance to change her testimony, which she refused to do.  Again, Moore's testimony was delivered confidently and credibly, and she demonstrated a very detailed memory of the event. Boyce's protests that she was somehow confused because her husband had died some months before, or because government counsel was somehow unfairly pressuring her, were not well taken.

The court has now held numerous evidentiary hearings in this case, reviewed multiple briefs submitted by the parties, and listened to the testimony of numerous witnesses.  Boyce himself was the least credible witness throughout the proceedings.  On the other hand, the testimony of Deshaies, Reichart and even Moore (who, of course, was called by the defense) was

all very credible.[5]  While Boyce managed to create factual disputes in this case pertaining to the

traffic stop, the court concludes that he has failed to carry his burden of proving by a

preponderance of the evidence that the conduct of Officer Deshaies was violative of Boyce's

Fourth Amendment rights in any way.  Boyce was afforded ample opportunity to present his

arguments, but he failed to present any credible evidence to support those arguments, or any

credible evidence to refute the version of events recounted by Deshaies.  For all of these reasons,

Boyce's motion to suppress evidence is denied.

---

[5]  Not only was Deshaies's testimony credible, notwithstanding his admitted error concerning Boyce's photograph (or lack thereof) on his in-car computer, but the government also presented the testimony of other Fort Wayne Police Department employees to corroborate Deshaies's version of events.  For example, Dawn McGahen, a FWPD dispatch supervisor, testified about how police radio communications are conducted and documented, and corroborated Deshaies's prior testimony about how he conducted his communications requests when he stopped Boyce.  Tr. of Hearing, July 24, 2009, pp. 50.  Cheryl King, a Date Control Specialist in the Warrants Division of the Allen County Sheriff's Department, testified about the procedure the department utilizes to confirm the validity of out of state warrants that show up for individuals detained and/or arrested by Allen County and Fort Wayne law enforcement officers. *Id*, p. 49-64.  King was called to corroborate Deshaies's testimony that when he ran Boyce's identification information on his in-car computer after pulling him over, information came back indicating that Boyce had an outstanding arrest warrant from the State of California.  (Boyce attempted to raise factual disputes about this warrant and whether it was a legitimate basis for his arrest.  The court dealt with this issue at length in its prior Opinion and Order issued on April 17, 2009–docket at 61–and concludes that it is not necessary to revisit the issue here.)  King's testimony corroborated Deshaies's recollection on the issue of the California warrant.  Finally, Fort Wayne Police Officer and certified "drug dog" handler John Drummer was called to testify. *Id*., pp. 94-103.  Drummer testified that he arrived at the scene of the traffic stop after Deshaies made a radio request for a narcotics unit.  *Id*., p. 98.  Drummer's trained K-9 detected drugs in Boyce's vehicle.  *Id*., pp. 101-102.  Drummer's testimony corroborates Deshaies's testimony that drugs were found in the vehicle.  It also refutes Boyce's testimony that he was not in possession of narcotics on the day he was pulled over and subsequently arrested.  In summary, there is a great deal of evidence that serves to corroborate Deshaies's testimony, which serves to bolster Deshaies's already credible testimony.

**CONCLUSION**

For the reasons discussed herein the motion to dismiss and the motion to suppress evidence filed by defendant Charles Boyce are both DENIED.  This case will be set for final pretrial conference and  trial by way of a separate docket entry.


Date: February 16, 2010.


  /s/   William C. Lee
William C. Lee, Judge
United States District Court
Northern District of Indiana